PUBLIC ADMINISTRATOR OF THE COUNTY OF NEW YORK, as Administrator of the Estate of GEORGE H. PIERRE, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30337.)

Court of Claims, January 15, 1955.

*Hyman H. Smith, Jacob D. Fuchsberg* and *Irving A. Thau* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Gerald Sokoloff* of counsel), for defendant.

LAMBIASE, J. The deceased above named died on or about the 26th day of October, 1948, as the result of injuries sustained by him through the alleged negligence of the State of New York, its officers and employees, while he was a patient at the Kings Park State Hospital, a hospital owned, maintained, and operated by the State of New York for the care and treatment of the mentally ill.

The claim filed June 13, 1950, pursuant to an order of this court made upon an application for permission to file, and finally submitted after trial to this court for determination on October 7, 1954, alleges two causes of action: the first for the wrongful death of the deceased, and the second for conscious pain and suffering of the deceased before his death. It is alleged in the claim that:

" Sixth:   *   *   *   That on said date while said intestate was marching with other patients under the direction of the State of New York, its officers, guards, agents, servants and/or employees, on the hospital grounds, the State of New York, its officers, guards, agents, servants and/or employees, were negligent and careless in failing to keep intestate in line with the

marching patients and permitting him to ascend the roof of a nearby building from which he jumped or fell off.

"Seventh: That the State of New York, its officers, guards, agents, servants and/or employees, were further careless and negligent in that they failed to provide proper supervision; in that they failed to maintain a sufficient number of guards; in that they failed to take cognizance of the maniacal and homicidal propensities of the intestate, and in that they took no steps to prevent this occurrence. By reason of the foregoing the intestate suffered injuries resulting in his death."

On the other hand, it is the contention of the State of New York that the manner in which decedent came to his death was not reasonably foreseeable or preventable; that it was the result solely of decedent's negligence; and that, therefore, no liability may be charged against it. In our opinion, the position of the State of New York is untenable, and claimant is entitled to recover to the extent hereinafter more particularly set forth.

The deceased, a native of Trinidad, British West Indies, had been duly certified as mentally ill with a mental diagnosis of schizophrenia, and with a notation on his court certification as follows: "*Dangerous tendencies:* Patient might possibly injure himself and others." (Exhibit 9, page 2, "Court Certification".) When he was admitted to Kings Park State Hospital on February 3, 1948, deceased was classified as "dementia praecox: hebephrenic type." (Exhibit 9, page 3, "Admission Note".) This diagnosis persisted until his death.

At the beginning of his stay in the Kings Park State Hospital, deceased was restless; he did not know the reason for his hospitalization; he quarreled; and he wanted to be released notwithstanding his condition. Later he made a satisfactory adjustment and was more co-operative, followed the usual ward routine, and was no problem in management. He worked on the ward. (Exhibit 9, Clinical Note, March 2, 1948.) On March 10, 1948, he was transferred to ward 60, a ward wherein were confined quiet and well-behaved patients. Apparently the hospital authorities did not have much trouble with the deceased until on and about June 1, 1948, on which date he was interviewed by a United States immigration inspector who informed the deceased that he was to be deported to his native Trinidad. The inspector also asked the deceased whether he wanted to return voluntarily to his native land, to which deceased answered that he did not. Deceased was also then informed by said inspector that under such circumstances he would be deported. The reactions of the deceased to the interview, in the words

of the State psychiatrist in charge of ward 60, " responded according to his whole mental condition; namely, according to a schizophrenic." (S. M. 277.) It was the impression of the aforesaid psychiatrist, who was present at said interview, gained as a result thereof and by observation of the deceased subsequent thereto, that the deceased might try to escape from the institution so as to put himself beyond the service upon him of a deportation warrant. The psychiatrist concluded that there should be necessary supervision of the deceased to prevent it, and he, therefore, gave instructions on that day to the male supervising nurse that deceased be kept in close supervision. (S. M. 278.) This was done, and as a result of which deceased was confined until the day of his death to the building in which ward 60 was contained and was not permitted to go to the mess hall located in another building to eat with other patients.

Following the date of said interview, there appears in the " Clinical Notes ", Exhibit 9, the following entries concerning deceased:

" July 12, 1948: * * * He is suspicious and thinks his answers twice over and then observes the examiner and the kind of impression his answer makes on him. He is a sly fellow, very careful of his talk."

" August 16, 1948: * * * He is very suspicious, seclusive and before answering a question he is hesitating. He thinks it over, gives half an answer and tries to observe the effect."

" September 15, 1948: Patient is the same as described above, besides some suspiciousness and emotional flatness no special findings can be established today."

" October 7, 1948: * * * He is suspicious and seclusive, hardly ever mingles with the other patients."

During the period of October 16, 1948, to October 31, 1948, the psychiatrist regularly in charge of ward 60 and of deceased was temporarily away from the institution, and another psychiatrist was placed in charge thereof. Several times since June 1, 1948, and prior to October 26, 1948, deceased had requested that he be permitted to go to take his meals with other inmates in the mess hall located in another building. This was refused him. However, on the 26th day of October, 1948, and during the temporary absence afore-mentioned of the regular psychiatrist, the request of deceased for permission to eat with the other inmates in the mess hall in another building, having been brought to the attention of the psychiatrist then temporarily in charge, said psychiatrist determined that the deceased " was a suitable risk to go to the dining hall." (S.M. 24), and he granted the

request. Deceased, therefore, was permitted on October 26, 1948, to go out of the building with other patients to the mess hall for lunch. After having had his lunch and at about 11:00 o'clock in the morning, deceased succeeded in escaping from the assembly hall of the mess building where the inmates gathered before and after their lunch. His escape was immediately noticed, and he was pursued by attendants, but they lost sight of him and were unable to catch him. A few minutes later he was found on the grounds near one of the buildings with injuries from which he died within an hour. Although no witness was produced who saw how the deceased actually sustained his injuries, it is a fair inference, it seems to us, that he either jumped from or fell off the roof of one of the institution buildings.

In our opinion the psychiatrist who granted the permission granted it without adequate and proper examination of the deceased and of his hospital record, and without properly considering the impact of the impending threat of deportation upon the whole mental condition of deceased as disclosed by said hospital records. It is probable that the failure of said psychiatrist to properly make said examinations and to follow standard and approved psychiatric procedures was caused by the fact that he had about 1,300 patients in his care at that time. However, while that may serve to explain his failure or inability so to do, it does not justify in law the actionable neglect which it constitutes.

It also appears that in the so-called assembly hall of the mess building there were at the time of the escape of the deceased about 130 inmates with only four attendants in charge. Two of the attendants were at the door through which patients were entering and going out of said assembly hall, and the other two were floating around among the inmates in the assembly hall. We do not think that said supervision was adequate as to the deceased in the light of the testimony of his regularly assigned State psychiatrist.

It was the duty of the State to use reasonable care and diligence not only in treating, but in safeguarding the deceased, measured by his capacity to provide for his own safety. (*Martindale* v. *State of New York,* 244 App. Div. 877, affd. 269 N. Y. 554; *Shattuck* v. *State of New York,* 166 Misc. 271, affd. 254 App. Div. 926; *Root* v. *State of New York,* 180 Misc. 205; *Van Patter* v. *Towns Hospital,* 246 N. Y. 646; *Gould* v. *State of New York,* 181 Misc. 884; *Wilcove* v. *State of New York,* 146 Misc. 87.) And it has been held that insufficiency of attendants

in a State mental institution is an act of negligence on the part of the State. (*Curley* v. *State of New York,* 148 Misc. 336, 339, affd. *sub nom. Luke* v. *State of New York,* 253 App. Div. 783; *Weihs* v. *State of New York,* 267 App. Div. 233; *Martindale* v. *State of New York, supra; Dimitroff* v. *State of New York,* 171 Misc. 635.) In our opinion this record presents a failure upon the part of the State of New York to fulfill its duty toward the deceased as that duty has been judicially defined, and presents no basis for finding the deceased negligent.

At the time of his death, deceased was 23 years of age, and his life expectancy according to the American Experience Tables was 40.85 years. He left him surviving in Trinidad his mother, Agnes Pierre, aged 55, whose life expectancy at said time was approximately 17.78 years, and who was dependent upon the deceased for support, and to whom deceased had made periodic contributions from his earnings over an appreciable period of time prior to his commitment. He also left him surviving three sisters, all adults, also living in Trinidad, British West Indies, but the record does not indicate that they were dependent upon him for support or that they had a reasonable expectation of some pecuniary benefit from the continuance in life of the deceased. For an appreciable period of time prior to his commitment, deceased had been quite steadily employed as a seaman, and had earnings at times of as much as $172.50 a month exclusive of board and meals while aboard ship.

Upon this record we may not say with a reasonable degree of medical and psychiatric certainty that claimant's mental illness, viz., dementia praecox: hebephrenic type, was such that he would be forever precluded from being released and from returning to some gainful employment. The record indicates that in such mental illness there would be periods of remission during which deceased would be able to resume his place in society and perform some gainful work the nature of which, however, not being disclosed. The frequency and the duration of said periods of remission, it was testified, could not be forecast with reasonable medical and psychiatric certainty. At any rate, we are not able to agree with the State of New York that because of the mental illness of the deceased no award of substantial damages may be made herein.

The computation of damages in death cases is always a difficult task, and it is more difficult herein because of the complexities with reference to claimant's condition of mental health hereinbefore discussed. In the light of this record we award the sum of $7,500 for the first cause of action, viz., for the

wrongful death of the deceased. We make no award for funeral expenses since no proof of any expenditure for said purpose was made upon the trial.

Turning now to the second cause of action, viz., that for conscious pain and suffering, it does not appear from the record that deceased did suffer conscious pain and did undergo conscious suffering in connection with the fatal injuries sustained by him, and we are, therefore, unable to find that he did. We, therefore, make no award under and for said second cause of action.

Objection was made by the State of New York to the admission into evidence of part of Exhibit 10 in evidence which is entitled " Accident, Injury and Escape Report " (S. M. 205–215). The part objected to particularly is that appearing under the caption " Date and Hour of Injury and Death ", which describes the events immediately preceding the death of the decedent and relates matters not witnessed by the State psychiatrist making and signing the report but reported to him by the other employees of the State of New York. We think the exhibit was properly admitted in evidence as an admission on the part of the State of New York. (*Reed* v. *McCord,* 160 N. Y. 330, 341; *Koester* v. *Rochester Candy Works,* 194 N. Y. 92, 98; *Gangi* v. *Fradus,* 227 N. Y. 452, 456; Ford on Evidence, 1935, vol. 2, § 172, p. 903; Richardson on Evidence [7th ed.], 1948, § 357.) In the light of the foregoing another ground for admission into evidence is section 374-a of the Civil Practice Act. (See, also, *Johnson* v. *Lutz,* 253 N. Y. 124.) And we are not unaware of the decision in the claims of *Cox* v. *State of New York* (282 App. Div. 815; reargument granted in part, 282 App. Div. 846; mod. 282 App. Div. 912).

We conclude, therefore, that claimant is entitled in all to an award in the sum of $7,500 as and for damages under the first cause of action, viz., that of wrongful death, with interest thereon from October 26, 1948 (the date of death of the decedent), through October 20, 1949, said latter date being six months from April 20, 1949, the date of the appointment of the personal representative herein and the date of the accrual of the cause of action (Court of Claims Act, § 10, subd. 2); and from June 13, 1950, the date when the claim herein was filed pursuant to order of this court, to the date of entry of judgment. Interest is not allowed upon the award from October 21, 1949, to June 12, 1950. (Court of Claims Act, § 19, subd. 1; *Sutherland* v. *State of New York,* 189 Misc. 953, and cases cited therein).

For the reason hereinbefore set forth claimant's second cause of action, viz., that for conscious pain and suffering of the deceased, must be and hereby is dismissed upon the merits.

The foregoing constitutes our written and signed decision herein. (Civ. Prac. Act, § 440.)

Let judgment be entered accordingly.