Dorothea E. Donaldson, J.
This is an action for damages for wrongful death and for antecedent pain and suffering. The cause is prosecuted here by the intestate’s widow and sole distributee under limited letters of administration granted by the Surrogate’s Court of Bronx County on October 31, 1960. The claim was timely filed and has not been submitted to any other court or tribunal for determination.
The evidence at trial indicated that Andrew Kardas, a retired employee of the Metropolitan Life Insurance Company, died by his own hand on August 28, 1960. The deceased had a long history of mental illness, consideration of which is essential in determining if there was liability on the part of the State.
Andrew Kardas was born, according to the best available evidence, on January 2, 1894. He married Anna Gierke, the claimant herein, on September 27, 1913. There were no issue of the marriage.
According to the record, the decedent first began to exhibit mental abnormality sometime in 1953. Apparently, this took the form of burning sensations in the mouth not attributable to any organic disease. He consulted a physician who assured him his throat appeared normal and that he did not have, as Mr. Kardas had feared, cancer. Despite the reassurances of this and another physician, however, the decedent became increasingly despondent and depressed, and in May, 1954, attempted suicide by slashing his wrists. His mental deterioration was deemed sufficient at this time to require hospitalization and he was admitted to the Pinewood Sanatorium in Katonah, New York. He remained there until July 19 of that same year. He was next hospitalized at West Hills Sanatorium from July, 1956 to September, 1956. He was admitted as a voluntary patient to New York Psychiatric Institute, a facility of the New York State Department of Mental Hygiene, in New York *245 City, on November 8, 1956: He was discharged therefrom on September 26, 1957, readmitted again voluntarily on April 27, 1960 and discharged on August 1, 1960. His third and final voluntary readmission was on August 10, 1960. Andrew Kordas was originally referred to the New York Psychiatric Institute by a private physician for consideration for a lobotomy or some other form of psychosurgery, procedures which were not undertaken. The diagnosis made at the time of his discharge in 1957 was “ psychoses due to unknown or hereditary cause but associated with organic disease (basal ganglion disease) with other diseases of the brain and nervous system.” His condition was described as improved following his original stay and he was released to his own care.
Exacerbation of Mr. Kardas’ symptoms of restlessness, repetitive movement, somatic delusion with respect to burning sensations in his month and depression led to his second admission to the institute. Also at this time, appear references in the doctor’s chart, claimant’s Exhibit No. 10, to a double suicide pact which had apparently been made by the deceased and his wife. He was again released this time to the custody of his wife after having remained essentially asymptomatic for a period of two weeks. The diagnosis remained the same. The staff of the institute agreed that the prognosis was guarded and that permanent institutionalization might eventually be required.
The readmission summary of August 10, 1960 states that during the prior hospitalization the patient ‘ ‘ was found to be reasonably well controlled on a combination of Cogentin, Niamid and Librium * * *. He was discharged on August 1, 1960 on the above medications. He was scheduled to be followed in the Tuesday drug clinic. On his first visit to the clinic, however, on August 9th, the patient was found to be highly agitated, depressed, weepy and complained bitterly of burning of tongue and hard palate once again. It was felt by observers in the clinic that he presented a definite suicidal risk and should be readmitted to this hospital at once. Neither the patient nor his wife is able to give much history as to what happened at home during his ten days there except to report that as soon as he came home everything began to go wrong again. On the day of admission here, the patient was affable, smiling and seemed perfectly at ease. He could not understand why he had been asked to return to the hospital. Two hours later, however, the patient was found on the ward crying bitterly, in a highly agitated mood, complaining of severe burning of the mouth and stating that he avus depressed, unhappy and \Adshcd he was dead.”
*246 The admitting doctor’s impression or initial diagnosis was “ chronic brain syndrome associated with cerebral arteriosclerosis, agitated depression The prognosis was described as poor with the observation that the patient would probably require permanent institutionalization. The treatment plan proposed involved retaining Mr. Kardas on the “ same drug regimen as the one on which he was discharged, while being-kept under close observation on the ward”. The admitting physician testified, however, that he did not consider Mr. Kardas to be a suicidal risk.
The decedent was assigned to the same ward he had formerly occupied, 7 North. The evidence showed that this ward could, and on occasion would, become a ‘ ‘ closed ” or “ locked ’ ’ ward, entrance to and departure from which would be by way of a locked door. This procedure or, alternatively, the exclusive assignment of two attendants to guard an unusually disturbed patient would be resorted to when the diagnosis of one of the 10 to 14 patients ordinarily assigned to the ward so mandated. At other times, the entrance and departure procedure was less rigid. Patients who had street clothes available to them in the ward would have to pass the nurses’ station in order to reach an elevator. The elevator operators had directions, according to testimony by Dr. Malitz of the institute’s staff, to transport only those patients accompanied by a nurse. The stairwells serving the ward were, at least, during the period August 27 to August 28, 1960, kept locked.
During his final admission the decedent’s condition fluctuated widely. At times, the final summary note in the doctor’s chart reveals, he was apparently lucid, affable, and symptom-free. At other times he was quite depressed, crying and complaining bitterly of burning sensations in the mouth. During these severe depressed periods, he seemed to exhibit a loss of muscular co-ordination and would lie on the floor, rolling rhythmically back and forth, his face grimacing and the sensorium evidencing severe clouding. After about a week of his stay, Mr. Kardas ’ agitation seemed to be increasing. The medication was changed and, on August 25, he was started on increasing-doses of a sedative, chloral hydrate. There was improvement, but by the evening of August 26, he again became agitated and the medication had to be increased.
About 8:30 the following morning, August 27, 1960, the institute discovered that the deceased had eloped. Iiis wife testified that he appeared at their Bronx apartment at about 9:00 a.m., spoke with her, left a handwritten note and departed after some 10 or 15 minutes. The note was admitted into evidence *247 over objection based on a lack of proper foundation therefor and over objection to its allegedly hearsay character, as an exhibit received not as evidence of the truth or falsity of the statements contained therein but solely to show the state of mind of the declarant. (Waterman v. Whitney, 11 N. Y. 157.) Its purport could be fairly deduced as indicating an immediate intent to commit suicide.
Mr. Kardas was discovered at about 10:00 a.m., lying on the ground at East 233rd Street and Bronx Boulevard. He was found, stated the investigating officer, rolling back and forth and his lips were said to be burnt. Beside him lay a bottle labeled “ Houshold Ammonia”. Mr. Kardas was removed to Misericordia Hospital and subsequently to Jacobi Hospital where he died on August 28. An autopsy by the Bronx Medical Examiner’s office stated the primary cause of death to be “ acute corrosive gastro-enteritis. Ingestion of ammonia soap ’ ’.
Three issues were thus presented to the court. First, were the State and its representatives chargeable with negligent conduct in not classifying the decedent a .suicidal risk and placing him under appropriate restraint? Second, were the State and its representatives negligent in permitting the elopement of a patient who, while not having exhibited such tendencies theretofore, had been placed under close observation? Third, even though the State and its representatives were to be found to have acted negligently, could such conduct be construed to be the proximate cause of the death complained of?
In considering the first question posed, the court observes that the State preserved a continuing objection to admission of that part of the medical record of the institute which it deemed multiple hearsay. Decision was reserved. It is well settled that entries in hospital records are within the “business entry” statute, now CPLR, 4518. (Meiselman v. Crown Hgts. Hosp., 285 N. Y. 389.) The hearsay exception extends to recorded information obtained by observation by all persons under a duty so to report. (Public Administrator of County of N. Y. v. State of New York, 207 Misc. 726, revd. on other grounds 286 App. Div. 573, mot. to dismiss app. den. 6 N Y 2d 994.) 'I’iie problem arises when statements by outsiders ¡lot under a duty to report are incorporated in the hospital records and are then offered as en Irles under CPLR 4518 when, in other words, hearsay is piled upon hearsay, (Cox v. State of New York, 3 N Y 2d 693.) For such an entry to be admissible the report, itself, must, if hearsay in character, come in under a recognized excep tion and, also, it, must be the business of the recorder to set down such statement. (5 Weinstein Korn Miller, N. Y. Civ.
*248 Prac., par. 4518.11 [1963].) In the case at bar, the principal objections by the Attorney-General were directed toward that portion of the admissions certificate of August 10, 1960 which stated that “ (i)t was felt by observers in the Clinic that he presented a definite suicidal risk ”. The reference is to the Vanderbilt Clinic, a facility of the Columbia Presbyterian Medical Center. It appears from the record that the residents and staff of the clinic are on the staff of the Psychiatric Institute as well and, indeed, rotate. The question then is raised whether the identity of personnel is such as to create an organizational entity insofar as 4518 is concerned. If this is so, the clinic members certainly being under an obligation to impart belief of potential suicidal tendencies and the institute being under an equal duty to receive and record such impressions, the entry would be admissible. On the evidence adduced, the court finds that a sufficient identity existed and receives the entry.
However, the determination of the existence and gravity of suicidal tendency calls for a purely professional judgment on the part of the examining physician. While he no doubt is under a medical duty to consider all available evidence in reaching his diagnosis, the final responsibility is his, and in the absence of proof that there was a want of requisite knowledge or skill or an omission to use reasonable care or a failure to use his best judgment, the diagnosing physician or, derivatively, the State cannot be held liable for what, in retrospect, proved to be an error in judgment.
Proceeding to the second of the questions posed, the court finds that notwithstanding the failure to term the deceased suicidally inclined and so insure for him a more thorough and extensive control, action was taken to place Mr. Kardas ‘' under close observation”. Whether this “close observation” was for purposes of observing the patient’s need for and reaction to various therapies or whether it was to serve as a device for protecting the deceased from himself or some combination of the two docs not satisfactorily appear from the record. While it may be assumed that the diagnosis of mental disorder without specific suicidal tendencies was within the bounds of a reasonable professional judgment, the court finds that the institute had notice of an alleged prior suicidal attempt by Mr. Kardas and notice of the Vanderbilt Clinic’s current opinion that he was suicidally inclined. The medical staff was, as we have held, under no compulsion to establish its diagnosis upon this foundation, but certainly actual notice existed of the possibility of suicide.
*249 The State urges that the claimant’s intestate had never manifested escapist proclivities and that, therefore, the elopement was a risk not reasonably to be perceived. If we adopt the classic phrase of Chief Judge Cabdozo that the ‘ ‘ risk reasonably to be perceived defines the duty to be obeyed” (Palsgraf v. Long Is. R. R. Co., 248 N. Y. 339, 344), we find that the duty here has been defined by the direction that the decedent was to be kept under close observation. Manifestly, this was not accomplished. The State’s breach of its duty to use reasonable care did not arise out of a misapprehension of the risk involved in not placing the decedent under suicidal observation but rather, having made a diagnosis and having determined upon a course of therapy, then negligently failing to fulfill that course. The record is clear that Andrew Kardas was to be permitted to leave the immediate area of the ward only upon “ accompanied walks ” in the presence of staff personnel. The ward was under continuous observation. The stairwells were locked. The only other method of egress, the elevator, was under the control of operators who were forbidden to transport a patient in the absence of a nurse. The court finds that the supervision given this patient was faulty and answers the second question posed above in the affirmative.
Even though negligence is thus found there remains the question of proximate causation. For the State to be compelled to respond in damages, the act or omission complained of must be causally related to the suicide. The State has argued that the record reflected no reasonable likelihood of danger as a consequence of the act complained of, to wit, permitting the elopement. The court disagrees. The mere fact that the decedent was classified other than as a potential suicide does not, under the circumstances, rule out or even render unlikely an act of self-destruction. It was apparent from the hospital records that Mr. Kardas had become increasingly agitated prior to his escape. This, coupled with the notice that existed of his prior suicidal tendencies, was sufficient or should have been sufficient to alert the institute to the possible consequences of an elopement, i.e., a suicide.
The court therefore finds that the State, through its officers and employees, is chargeable with negligent conduct and that such conduct was a competent producing cause of the death of claimant’s intestate. The State’s motions to dismiss made at the conclusion of claimant’s direct ease and at the conclusion of the trial, decision upon which was reserved, are denied.
There remains to be considered the quantum of damages. The court finds that the decedent had a life expectancy of *250 approximately 12 years according to statistics of the United States Department of Health, Education and Welfare. Mr.Kardas was receiving at the time of his death $113.34 per month from the Metropolitan Life Insurance Company, payments which were to continue until his death. He was also receiving social security payments of $105 per month, again to continue until his death. However, it is a fair assumption from the decedent’s age and physical and mental condition that he never would have been able to earn any further sums and indeed, in all probability, would have had to be institutionalized for the remainder of his life. Normally, the rule is that where evidence sustains a finding that a patient in a State hospital is incurable and that no reasonable basis exists for hope for his ultimate cure and release, the only damages recoverable for his wrongful death apply from any possible cause of action for conscious pain and suffering or for funeral expenses incurred. (St. Pierre v. State of New York, 272 App. Div. 973.) An apparent exception exists, however, where income to a next of kin results from disability payments. (Liddie v. State of New York, 190 Misc. 347.) The case at bar is analogous since the payments under Metropolitan’s retirement program and under social security are dependent only upon the continued life of the insured and not upon his potentialities as a breadwinner. Furthermore, it appears as in Liddie (supra) that these payments were not required to reimburse the institute for Mr. Kardas ’ care.
While the proof under the conscious pain and suffering cause of action was minimal, the cause was properly before the court and an award will be made therefor.
The court determines that the claimant is entitled to damages in the amount of $20,616 for the wrongful death of Andrew Kardas, with interest thereon from August 28, 1960, to date of entry of judgment and the claimant, as administratrix of decedent’s estate, is entitled to damages in the amount of $1,500 for conscious pain and suffering. The sum first named includes $616 as an adjusted amount representing reasonable funeral expenses.